IN THE UNITED STATE DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) BANK 7, | ) | |
|     An Oklahoma state banking association, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CIV-14-0823-F** |
| | ) | |
| (1) WHEELER FEED YARD, INC., | ) | |
|     a Texas corporation, | ) | |
| | ) | |
|     Defendants. | ) | |

## PLAINTIFF, BANK 7'S AMENDED (POST-TRIAL) PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, Bank 7 in accordance with this Court's direction at the conclusion of the trial of this matter, respectfully submits the following amended proposed findings of fact and conclusions of law for the Court's consideration.  Bank 7 has addressed the legal issues on which the Court requested briefing in the "Conclusions of Law" below, and thus Bank 7 is not filing a separate post-trial memorandum of law so as to not burden the Court with redundant material.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial was held before me, the Honorable Stephen P. Friot, United States District Judge for the Western District of Oklahoma, on September 22 - 23, 2015. The Plaintiff, Bank 7, appeared through its in-house counsel, Henry Litchfield and its counsel of record, Douglas L. Jackson of Gungoll, Jackson, Box & Devoll, P.C.  The Defendant, Wheeler Feed Yard, Inc. appeared through its vice-president and manager, Stacy

McCasland and its counsel of record, John F. Massouh and Kevin T. Wakley of Sprouse Shrader Smith, PLLC.  After having received the evidentiary exhibits and the report of Defendant, Wheeler Feed Yard, Inc.'s expert, and having heard the sworn testimony of witnesses and the arguments of counsel the Court, FINDS and ORDERS as follows:

## FINDINGS OF FACT

Any finding of fact herein more properly deemed a conclusion of law shall also constitute a conclusion of law and is adopted as such.

1.     The Plaintiff is Bank 7, a state banking association, chartered pursuant to the laws of the State of Oklahoma, with its principal place of business located in Oklahoma County, State of Oklahoma (hereinafter: "Bank 7").

2.     The Defendant is Wheeler Feed Yard, Inc., a corporation formed pursuant to the laws of the State of Texas, with its principal place of business located in Wheeler County, State of Texas (hereinafter: "Wheeler").

3.     Trent Wilson is an individual and a resident of Ellis County, Oklahoma (hereinafter: "Wilson").

4.     Wilson had been a long time customer and borrower of the First State Bank of Camargo ("FSB") with his earliest documented loans from FSB presented in evidence in this case going back to 2001.  (See: Testimony of Eric Thompson, Tr. pg. 17, line 22 through pg. 18, line 5; and Exhibit 11).

5.     Unbeknownst to FSB or Bank 7, Wilson also was feeding cattle with Wheeler for approximately ten years prior to the trial in this case.  (See: Testimony of Stacy McCasland, Tr. pg. 106, line 4-12).

6.     Wilson's 2001 loans with FSB were FSA guaranteed loans and the packager for the loans, Tom Eike, testified that he did not know Wilson was feeding cattle and that, with one exception regarding a small group of cattle that went to Cattleman's Choice years ago, Wilson had never discussed with him that he was going to feed cattle.  (See: Testimony of Tom Eike, Tr. pg. 291, lines 6-11 and pg. 315, lines 4-15).  He further testified that although the FSA plans he prepared for Wilson make reference to "feeder cattle" that reference was an error in nomenclature and that the plan, as described in the FSA Guaranteed Loan Narrative, was clearly a stocker cattle plan.  (See: Testimony of Tom Eike, Tr. pg. 286, line 15 through pg. 287, line 17; and pg. 290, line 25 through pg. 291, line 5; and Defendant's Trial Exhibit 26, pg. 4269, description of the "agricultural enterprise.").  Mr. Eike testified the erroneous "feeder cattle" reference was a mistake that appeared in all of the plans he submitted to FSA, not just Wilson's.  (See: Testimony of Tom Eike, Tr. pg. 320, lines 17-24).

7.     In order to secure the original 2001 promissory notes and any extensions or renewals thereof and all other indebtedness of Wilson to FSB, Wilson executed security agreements in favor of FSB that granted a security interest to FSB in: "All livestock / farm products of every kind and description including but not limited to beef and dairy cattle, branded or unbranded, plus any increase therefrom, and including steers and bulls" and all proceeds.  (See: Testimony of Eric Thompson, Tr. pg. 17, line 22 through pg. 18, line 8; and Plaintiff's Trial Exhibit 12).

8.     FSB filed a UCC-1 financing statement with the office of the county clerk of Oklahoma County on February 27, 2007 against Wilson that named the debtor as

"Trent Wilson" and covered: "All livestock / farm products of every kind and description including but not limited to beef and dairy cattle, branded or unbranded, plus any increase therefrom, and including steers and bulls" and all proceeds.  (See: Plaintiff's Trial Exhibit 8, pg. 2).

9.      During his banking relationship with FSB and Bank 7, Wilson often engaged in "order-buying" where he would buy cattle for third parties and then be reimbursed by the third parties for the purchase price of the cattle bought.  (See: Testimony of Eric Thompson, Tr. pg. 39, line 17 through pg. 40, line 23; and Testimony of Tom Eike, Tr. pg. 312, lines 17-19; and pg. 313, line 22 through pg. 314, line 11).

10.     Wilson maintained a separate account at FSB, and subsequently Bank 7, for his "order-buying."  (See: Testimony of Eric Thompson, Tr. pg. 39, line 17 through pg. 40, line 23).

11.     FSB, and subsequently Bank 7, did not have a security interest in the cattle Wilson was order-buying because those cattle were inventory.  (See: Testimony of Eric Thompson, Tr. pg. 40, lines 20-23).

12.     On February 17, 2009, Wilson executed a promissory note and security agreement with Wheeler that granted a security interest to Wheeler in Wilson's currently owned and after-acquired cattle.  (See: Testimony of Stacy McCasland, Tr. pg. 111, lines 9 – 15; and Plaintiff's Trial Exhibit 62).

13.     Wheeler filed a financing statement in Texas against Wilson in the name of "Trent Wilson" but Wheeler did not file a financing statement against Wilson in

Oklahoma.  (See: testimony of Stacy McCasland, Tr. pg. 142, lines 5-11; and Plaintiff's Trial Exhibit 62).

14.     Although Wilson's legal name is "Michael Trent Wilson," both parties to this litigation did business with him as "Trent Wilson" and all of the financing documents each party had with Wilson were in the name of "Trent Wilson."  (See: Testimony of Eric Thompson, Tr. pg. 32, lines 2-9; and Stacy McCasland, Tr. pg. 109, lines 11-16; pg. 11, line 9 through pg. 112, line 9; and pg. 123, lines 7-11.  See, also, Plaintiff's Trial Exhibits 1-12; 25-29; 53-62; and Defendant's Trial Exhibits 1-44; 64; 67-70; 72-76; and 77-78).

15.     Wilson files his tax returns as "Trent Wilson"; has the deed to his home in the name of "Trent Wilson"; and had all of his accounts with FSB in the name of "Trent Wilson".  (See: Plaintiff's Trial Exhibits 65-68; and Defendant's Trial Exhibits 68-68).

16.     Stacy McCasland, Wheeler's vice president and manager of operations ("McCasland") admitted in his testimony that he did not know Wilson by any name other than "Trent Wilson" until this lawsuit started.  (See: Testimony of Stacy McCasland, Tr. pg. 109, lines 17-25).

17.     The parties' exhibits, admitted by stipulation, showed that a lien search in Oklahoma, the state of Wilson's residence, using the names "Michael Trent Wilson", "Michael Wilson" and "Wilson, Michael Trent" would not have retrieved Plaintiff's lien filing.  (See: Defendants Trial Exhibits 49-52).  The evidence also showed that a lien search in Oklahoma, using the names "Trent Wilson" or "Wilson, Trent" does retrieve FSB's lien filing as well as the lien filings of several other creditors of Wilson. (See: Plaintiff's Trial Exhibits 76 and 77).

18.     Wheeler knew in 2009 that FSB had a lien against Wilson's cattle.  (See: Testimony of Stacy McCasland, Tr. pg. 112, lines 20 – 22; and pg. 143, lines 18-24).

19.     Wheeler contends it sent a subordination agreement to FSB on February 17, 2009.  However, Wheeler did not have a copy of that subordination agreement executed by FSB.  McCasland did not have personal knowledge the subordination agreement was mailed to FSB and McCasland never had any conversations with anyone at FSB.  There was no evidence presented that FSB ever received the subordination agreement and the agreement was not in FSB's files.  (See: Testimony of Stacy McCasland, Tr. pg. 112, line 13 – pg. 113, line 24; Testimony of Eric Thompson, Tr. pg. 13, lines 6-24).

20.     With respect to the cattle he fed at Wheeler, Wilson would buy cattle and pay for them himself and then he would contact Wheeler and let them know about the purchase and Wheeler would issue Wilson loan proceeds by means of a "Bill of Sale Draft" to cover the cattle purchased by Wilson.  (See: Testimony of Stacy McCasland, Tr. pg. 115, line 11- pg. 116, line 9).

21.     The "Bill of Sale Drafts" from Wheeler were Amarillo National Bank documents entitled: "Bill of Sale Draft and Security Agreement."  They identified the number of cattle involved in the transaction and identified Wilson as the "seller"; Wheeler as the "purchaser" and the Amarillo National Bank as the secured party.  They were made out only to Trent Wilson.  Most, but not all of them, contained a notation of "less equity" or "less eq" followed by a dollar amount.  (See: Plaintiff's Trial Exhibits 54 and 57).

22.     There was conflicting testimony from McCasland and Wheeler's expert witness, Van Baize ("Baize") as to what sort of transaction the "Bill of Sale Drafts" represented.   McCasland initially testified the documents transferred title to the cattle from Wilson to Wheeler, but then testified the documents reflected a lending relationship between Wheeler and Wilson.   McCasland admitted the documents were not a true representation of what was actually happening and would lead someone to believe they reflected a sale.   (See: Testimony of Stacy McCasland, Tr. pg. 125, line 9 through pg. 128, line 16).   McCasland also testified the funds transferred to Wilson via the "Bill of Sale Drafts" were loan proceeds and that Wilson retained ownership of the cattle until they were sold from Wheeler's feed yard and Wheeler had no ownership interest in the cattle.   (See: Testimony of McCasland, Tr. pg. 115, line 11- pg. 116, line 9; and pg. 118, lines 21-25).   Baize testified the "Bill of Sale Drafts" transferred title to the cattle (and risk of loss) from Wilson to Wheeler.   (See: Testimony of Van Baize, Tr. pg. 171, line 10 through pg. 172, line 1).   On cross-examination Baize testified some of the "Bill of Sale Drafts" represented sales and some represented financing arrangements.   (See: Testimony of Van Baize, Tr. pg. 187, line 3 through pg. 193, line 22).   Wheeler's counsel represented to the Court that it was Wheeler's position the "Bill of Sale Drafts" represented loan transactions, despite the language of the documents themselves, (and the testimony of Wheeler's expert) which Wheeler's counsel admitted could suggest a different relationship.   (See: Statement by John Massouh, Tr. pg. 130, lines 11-18).

23.     There was also conflicting testimony from Wheeler's witnesses as to what happened with the funds from Wheeler that were given to Wilson via the "Bill of Sale

Drafts."   McCasland testified that Wheeler's funds enabled Wilson to make the cattle purchases; i.e., were used to cover Wilson's checks used to buy the cattle.   (See: Testimony of Stacy McCasland, Tr. pg. 147, line 14 through pg. 148, line 2).   Baize, initially testified consistently with the testimony of McCasland, that the Bill of Sale Drafts from Wheeler would cover overdrafts in Wilson's account at FSB.  (See: Testimony of Van Baize, Tr. pg. 166, lines 8-23).   He then testified the funds were used to satisfy FSB's lien position by paying off their lien when Wheeler "cut this check back to First State Bank Camargo".   (See: Testimony of Van Baize, Tr. pg. 169, line 1 through pg. 171, line 3; and pg. 193, line 23 through pg. 194, line 9).   In light of the testimony from McCasland that no one from Wheeler ever had a conversation with FSB and, more importantly, the fact that the "Bill of Sale Drafts" from Wheeler do not name FSB or Bank 7 as a payee, the Court does not find Mr. Baize's testimony that the "Bill of Sale Drafts" paid of FSB's lien position to be credible.

24.     After purchasing the cattle, Wilson would then retain possession of the cattle for a period while he got them healthy and got them used to eating feed ("backgrounded" them) and then he would deliver them to Wheeler's feed yard.  (See: Testimony of Stacy McCasland, Tr. pg. 116, line 10 through pg. 118, line 25; pg. 146, line 19 through pg. 148, line 13).

25.     When Wilson's cattle were ready to be sold from Wheeler's feed yard, Wheeler would sell them to a packer and the packer would come and pick the cattle up from the feed yard.  The next day, following Wheeler's relinquishment of possession of

the cattle, Wheeler would be paid by the packer with a check made payable to Wheeler. (See: Testimony of Stacy McCasland, Tr. pg. 119, line 1 through pg. 120, line 9).

26.  Wheeler would then retain the amount it advanced for the cost of the cattle as well as its feed costs, interest, medical expenses, if any and hedging costs, if any, from the cattle proceeds and pay the balance of the cattle proceeds to Wilson by a check made out to Wilson only as payee.  (See: Testimony of Stacy McCasland, Tr. pg. 121, line 1 through pg. 123, line 9; and pg. 153, line 16 through pg. 154, line 22).

27.  The checks that Wheeler issued to Wilson as payee did not contain any notation on them that they were payments for cattle.  McCasland admitted that they could have been for trucking or hauling cattle or for Wilson's order-buying cattle for Wheeler. (See: Testimony of Stacy McCasland, Tr. pg. 159, line 8 through pg. 160, line 7; and Plaintiff's Trial Exhibit 55).

28.  On April 7, 2010 Wilson executed promissory note No. 87992 in the principal amount of $15,050.00 in favor of and payable to FSB.  (See: Plaintiff's Trial Exhibit 7).

29.  On April 21, 2010, Wilson executed promissory notes Nos.:

    a.  87985 in the principal amount of $230,800.00;

    b.  87986 in the principal amount of $40,000.00;

    c.  87987 in the principal amount of $298,200.00; and,

    d.  187988 in the principal amount of $70,900.00,

all in favor of and payable to FSB.  (See: Plaintiff's Trial Exhibits 3-6).  Each of these promissory notes clearly stated that it was a renewal of earlier promissory notes and

security agreements Wilson had executed in favor of FSB.  (See: Plaintiff's Trial Exhibit 3-7 and 11).

30.     In conjunction with obtaining an FSA guarantee on the 2010 promissory notes, Tom Eike, an FSA approved and certified general appraiser, did an appraisal of Wilson's cattle on September 4, 2009 wherein he personally counted approximately 472 head of cattle that Wilson represented to be his cattle and that were located on land either owned or rented by Wilson.  (See: Testimony of Tom Eike, Tr. pg. 317, line 15 through pg. 318, line 18; and Plaintiff's Trial Exhibit 10).

31.     Wheeler claims that on January 27, 2011 it mailed a second subordination agreement to FSB.  However, McCasland had no personal knowledge that the second subordination agreement was mailed.  (See: Testimony of Stacy McCasland, Tr. pg. 114, line 3 through pg. 115, line 10.).

32.     On or about January 28, 2011, FSB was closed and the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver of FSB.  The FDIC had been in the bank for 60-90 days prior to closing the bank and they had been logging in all of the mail that came into the bank.  (See: Testimony of Eric Thompson, Tr. pg. 10, line 9 through pg. 13, line 16).

33.     Also on or about January 28, 2011, Bank 7 acquired FSB and its assets, including Wilson's promissory notes, mortgages, and security documents, through a Purchase and Assumption Agreement with the FDIC. There was no subordination agreement from Wheeler in the bank file, nor did one come in on January 28, 2011.  (See:

Testimony of Eric Thompson, Tr. pg. 10, line 9 through pg. 12, line 4; and pg. 13, lines 17-24; and Plaintiff's Trial Exhibit 13A).

34.    Bank 7 was given only two or three hours to go into FSB and review the files and do any "due diligence" prior to entering into the Purchase and Assumption Agreement with the FDIC.  (See: Testimony of Eric Thompson, Tr. pg. 10, lines 11-24).

35.    Bank 7's senior vice-president at the time, Eric Thompson ("Thompson") was responsible for Wilson's loans after Bank 7 acquired FSB's assets from the FDIC. Thompson made numerous attempts to schedule cattle inspections with Wilson in early 2011 but Wilson would never agree to an inspection and eventually, in late June or early July of 2011 Wilson told Thompson that he had no cattle.  After being informed by Wilson that there were no more cattle Thompson told Wilson he needed to come into the bank and they needed to talk about his loans immediately.  (See: Testimony of Eric Thompson, Tr. pg. 18, line 9 through pg. 19, line 22).

36.    Wilson came into Bank 7 in August of 2011 with his lawyer, David Henneke and Mr. Henneke spoke on his behalf and informed Bank 7 that Wilson believed he did not really owe the bank money.  Every time Thompson attempted to inquire about the cattle, Mr. Henneke would cut him off by stating there were no cattle. (See: Testimony of Eric Thompson, Tr. pg. 19, line 11 through pg. 21, line 10).

37.    Bank 7 then turned the matter of Wilson's defaulted loans over to its legal counsel.  (Testimony of Eric Thompson, Tr. pg. 21, line 11 through pg. 22, line 7).

38.    The deposit items for Wilson's accounts were maintained in the bank's archive system and had to be retrieved as imaged items in a database stored on several

disks.  (See: Testimony of Eric Thompson, Tr. pg. 41, line 14 through pg. 42, line 10).

Thompson's testimony regarding when he first saw the "Bill of Sale Drafts" from

Wheeler was conflicting.   On cross-examination he agreed with Wheeler's counsel's

question, based on Thompson's prior testimony in a related bankruptcy proceeding, that

he, Thompson, had performed a "forensic audit" on Wilson's accounts where he would

have seen all of the deposit items, including the "Bill of Sale Drafts", sometime prior to

June of 2011.  (See: Testimony of Eric Thompson, Tr. pg. 71, line 25 through pg. 72, line

210.  However, the actual testimony from the Bankruptcy proceeding that Wheeler's

counsel read into the record did not reference the date on which the forensic audit

occurred.  (See: Tr. pg. 69, line 9 through pg. 71, line 14).  On re-direct Thompson

testified he believed he performed the forensic audit at the request of Bank 7's counsel

about the time Bank 7 turned the matter over to counsel.  (See: Testimony of Eric

Thompson, Tr. pg. 101, lines 3-14).

39.    Counsel for Bank 7 sent a demand letter to Wilson on December 8, 2011.

(Testimony of Eric Thompson, Tr. pg. 22, lines 13-21; and Plaintiff's Trial Exhibit 71).

40.    When attempts at negotiating the claim with Wilson failed, Bank 7 filed

suit against Wilson in April of 2012 in "Bank 7 v. Wilson, et. al.," Case No. CJ-2012-07,

in the District Court of Ellis County, Oklahoma ("Bank 7 v. Wilson").  (See: Testimony

of Eric Thompson, Tr. pg. 24, lines 17-22; and, Testimony of Brendon Atkinson, pg. 206,

lines 17-21).

41.    Prior to filing suit, Bank 7's attorney did a lien search in Oklahoma to

determine whether any other parties needed to be named as defendants who might be

claiming an interest in Bank 7's collateral on Wilson's notes. Bank 7's attorney testified that Wheeler would have been named as a defendant in the 2012 foreclosure suit in Ellis County if Wheeler had filed a financing statement in Oklahoma. (See: Testimony of Brendon Atkinson, Tr. pg. 204, line 2 through pg. 205, line 19).

42.    In July of 2012, in conjunction with Bank 7 v. Wilson, Bank 7 took Wilson's deposition. In that deposition Wilson told Bank 7 that he only had 50-60 head of cattle at the time he executed the promissory notes to FSB and that he had only sold cattle through certain livestock auctions. (See: Testimony of Eric Thompson, Tr. pg. 24, line 25 through pg. 26, line 18; and Testimony of Brendon Atkinson, Tr. pg. 206, line 22 through pg. 207, line 9).

43.    Bank 7 issued written discovery to Wilson in Bank 7 v. Wilson in October of 2012 requesting Wilson to produce all documents related to his cattle sales during the years 2004-2012. But Wilson failed to respond to the discovery. (See: Testimony of Brendon Atkinson, Tr. pg. 207, line 15 through pg. 208, line 3; pg. 209, lines 12-13; and Plaintiff's Trial Exhibits 32 and 35).

44.    In its efforts to trace the cattle, Bank 7, through subpoenas and correspondence, sought documents regarding Wilson's cattle sales from all entities Wilson had identified in his deposition in July of 2012 as places he where he had sold cattle. Bank 7 also, through its counsel, subpoenaed documents from a third party in Southeastern Oklahoma that the bank's counsel had located that had a judgment against Wilson, in the hopes of tracking down some of the cattle. (See: Testimony of Brendon Atkinson, Tr. pg. 208, line 4 through pg. 209, line 22).

45.     The District Court of Ellis County, Oklahoma granted partial summary judgment in favor of Bank 7 on March 19, 2013, in the amount of $733,166.84.  The Partial Summary Judgment ruled the amounts owed by Wilson to Bank 7 were secured by a "good and valid lien" on "All livestock/farm products of every kind and description including but not limited to beef and dairy cattle, branded or unbranded, plus any increase therefrom, and including steers and bulls now owned by debtor" and "all proceeds." (See: Plaintiff's Trial Exhibit 14).

46.     On June 3, 2013, soon after Bank 7 levied execution on its judgment against him, Wilson filed Chapter 12 Bankruptcy.  (See: Testimony of Brendon Atkinson, Tr. pg. 210, lines 10-15).

47.     Bank 7's counsel had not obtained the deposit items for Wilson's accounts, which included the "Bill of Sale Drafts" until August of 2013, after Wilson filed bankruptcy.  (See: Testimony of Brendon Atkinson, Tr. pg. 231, lines 5-15).

48.     Bank 7 took Wilson's deposition in his Chapter 12 Bankruptcy because Wilson had testified at the meeting of creditors that a large majority of his income came from order-buying cattle for other people and Bank 7's counsel believed it would be possible to get the bankruptcy dismissed.  In that deposition, taken September 6, 2013, Wilson told Bank 7's attorney that the "Bill of Sale Drafts" from Wheeler were for cattle purchased for Wheeler by Wilson as an order-buyer.  Bank 7's counsel specifically asked Wilson if he was feeding cattle and Wilson testified that he was not.  (See: Testimony of Brendon Atkinson, Tr. pg. 211, lines 2-20; and pg. 213, line 18 through pg. 214, line 10).

49.     Bank 7 then moved to dismiss Wilson's bankruptcy on the grounds that the income from order-buying did not qualify as farm income for a Chapter 12 bankruptcy and an agreed order was entered dismissing the case.   (See: Testimony of Brendon Atkinson, Tr. pg. 211, line 2 through pg. 212, line 5).

50.     Bank 7 then levied execution against Wilson again and Wilson filed for Chapter 7 Bankruptcy relief.   (See: Testimony of Brendon Atkinson, Tr. pg. 212, lines 13-17).

51.     On February 5, 2014 Bank 7 filed an adversary proceeding against Wilson in his Chapter 7 bankruptcy, challenging the dischargeability of Bank 7's judgment against Wilson.   Wheeler was not a party to that adversary proceeding.

52.     In February or March of 2014 Sharon Wilson, Wilson's ex-wife who was at that time in the middle of her divorce from Wilson, called Thompson and told him that Wilson had fed a lot of cattle at Wheeler and owed Wheeler a lot of money.   Thompson testified this was the first time he had heard that Wilson was feeding cattle.   (See: Testimony of Eric Thompson, Tr. pg. 33, line 6 through pg. 35, line 5).

53.     Bank 7 issued a subpoena to Wheeler on March 21, 2014, requesting: "All documents regarding all cattle transactions (including but not limited to the purchase, sale, feeding, financing and/or trucking of cattle), occurring between January 1, 2010, and the present, with/involving:   Trent Wilson, Flakey Wilson and/or F&E Wilson Family, LLC."   (See: Plaintiff's Trial Exhibit 42).

54.     Wheeler did not timely produce any documents in response to the subpoena and so Bank 7's counsel contacted McCasland directly on April 24, 2014, asking that the

documents be produced.  Bank 7's counsel followed up the conversation with a letter the same day confirming the discussion.  (See: Testimony of Brendon Atkinson, Tr. pg. 216, lines 2-20; and Plaintiff's Trial Exhibit 45).

55.     On April 24, 2014, Wheeler faxed a lengthy document to Bank 7's counsel that referenced Wilson and contained various codes and reference numbers but did not reveal the nature of the relationship between Wheeler and Wilson.  (See: Testimony of Brendon Atkinson, Tr. pg. 218, line 15 through pg. 219, line 19; and Plaintiff's Trial Exhibit 59).

56.     Bank 7's counsel followed up with a second letter to McCasland on May 9, 2014, again requesting that Wheeler comply with the subpoena issued to Wheeler two months earlier.  Wheeler did not produce any further documents pursuant to that request.  (See: Testimony of Brendon Atkinson, Tr. pg. 219, line 20 through pg. 220, line 2).

57.     Bank 7 deposed McCasland on July 17, 2014 pursuant to a subpoena duces tecum and McCasland brought to the deposition some additional documents entitled "performance records" that related to Wilson's relationship to Wheeler but did not bring any type of promissory note, security agreement or lien filings.  (See: Testimony of Brendon Atkinson, Tr. pg. 220, lines 5-24; and Plaintiff's Trial Exhibits 49, 60 and 61).

58.     On August 4, 2014 Bank 7's counsel received in the mail Wheeler's financing documents; promissory note, security agreement, the 2011 subordination agreement, and lien documents.  (See: Testimony of Brendon Atkinson, Tr. pg. 220, line 25 through pg. 222, line 8).

59.     Between August 18, 2009 and March 11, 2012, Wheeler received $3,939,542.08 in gross proceeds from the sale of Wilson's cattle.   The feed costs associated with those cattle were $2,029,904.46.   (See: Testimony of Eric Thompson, Tr. pg. 47, lines 6-9; and Plaintiff's Trial Exhibits 63 and 64).

60.     Bank 7 filed this case for conversion against Wheeler on August 4, 2014.

61.     On March 25, 2015, the court in Bank 7 v. Wilson, entered a deficiency judgment in favor of Bank 7 against Wilson in the amount of $672,596.75.   (See: Plaintiff's Trial Exhibit 23).

62.     As of September 23, 2015, Bank 7 was owed $640,999.48 on the judgment against Wilson.

## CONCLUSIONS OF LAW

Any conclusion of law herein more properly deemed a finding of fact shall also constitute a finding of fact and is adopted as such.

### Choice of Law

1.     Oklahoma's law applies to the parties' claims and defenses in this case. Federal district courts apply the choice-of-law rules of the state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496 (1941); *Bancoklahoma Mortgage Corp. v. Capital Title Co.,* 194 F.3d 1089, 1103 (10th Cir. 1999).   Bank 7's claim is for Wheeler's conversion of the cattle proceeds in which Bank 7 had a perfected security interest.   Both Oklahoma's choice of law provisions in its enacted version of the Uniform Commercial Code ("UCC") and its common law choice of law rules respecting tort actions, such as conversion, dictate that Oklahoma's law is controlling.   Okla. Stat.

tit. 12A § 1-9-301(1) provides: "[W]hile a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral."   Additionally, "A debtor who is an individual is located at the individual's principal residence."   Okla. Stat. Ann. tit. 12A § 1-9-307(b)(1).   Because Wilson is, and was at all relevant times, a resident of Oklahoma, Oklahoma's law is controlling with respect to perfection and priority of the parties' competing security interests.   However, the Court notes that Texas' adopted version of the UCC is virtually identical to Oklahoma's and as a result the outcome would be the same on the issues of perfection and priority if the Court were to apply Texas law.

Oklahoma choice of law rules for tort actions dictate that the law of the state with the most significant relationship to the occurrence and the parties will apply. See *Childs v. State ex rel. Oklahoma State University*, 1993 OK 18, 848 P.2d 571.   The Oklahoma Supreme Court has also noted "the law of the place of the wrong is not necessarily the applicable law for all tort actions brought in courts of this State," finding that the "most significant relationship test" provides the most appropriate result in determining which law applies. *Brickner v. Gooden*, 1974 OK 91, 525 P.2d 632, 637.   A substantial part of the events and omissions, if not the most important events and omissions giving rise to Bank 7's claim, took place in Oklahoma.   Accordingly, the law of Oklahoma is controlling on Bank 7's conversion claim.

## Perfection and Priority

2.     Bank 7 properly perfected its security interest by filing a UCC-1 financing statement in the office of the County Clerk of Oklahoma County, if its UCC-1 financing

statement sufficiently provided the name of the debtor.    Okla. Stat. tit. 12A §§ 1-9-310(a) and 1-9-501(2).

3.        Under Okla. Stat. tit. 12A §§ 1-9-506:

(a) A financing statement *substantially satisfying* the requirements of this part is effective, even if it has minor errors or omissions, *unless the errors or omissions make the financing statement seriously misleading.* (Emphasis added).

(b) Except as otherwise provided in subsection (c) of this section, a financing statement that fails sufficiently to provide the name of the debtor in accordance with subsection (a) of Section 1-9-503 of this title is seriously misleading.

(c) If a search of the records of the filing office under the debtor's correct name, using the filing office's standard search logic, if any, would disclose a financing statement that fails sufficiently to provide the name of the debtor in accordance with subsection (a) of Section 1-9-503 of this title, the name provided does not make the financing statement seriously misleading.

The version of Okla. Stat. tit. 12A, § 1-9-503(a)(4)(A) in effect at the time of the events at issue in this case provided that a financing statement sufficiently provided the name of the debtor in the case of an individual "if it provides the individual . . . name of the debtor."

Both FSB and Wheeler did business with Wilson under the name of "Trent Wilson."   Both parties had all of their financing documents under the name of "Trent Wilson."   Wheeler's own financing statement, erroneously filed in Texas, named the debtor as "Trent Wilson."   Wilson also held himself out to the community; filed his taxes and held the title to his home in the name of "Trent Wilson." Finally, Wheeler's vice-president and manager, McCasland testified that Wilson never used any other name than

"Trent Wilson" when he dealt with Wheeler and that he, McCasland had never heard the name "Michael Trent Wilson" until after this lawsuit was begun.

The Court finds the case of *Peoples Bank v. Bryan Bros. Cattle Co.*, 504 F.3d 549 (5th Cir. 2007) is analogous to the facts of this case and is, therefore, persuasive. In that case, Peoples Bank argued the competing creditor did not have a security interest in cattle because, as in this case, its financing statement did not use the debtor's legal name. *Peoples Bank*, 504 F.3d at 558-59. The court rejected the argument because the name the creditor had used was one under which the debtor held himself out to the community and did business and one with which Peoples Bank was familiar and used in its own files, again, similar to the facts of this case. *Peoples Bank*, 504 F.3d 549, 559. The Fifth Circuit applied a rational construction to the Code sections in question, concluding: "[E]valuating whether a filing is seriously misleading requires a court to examine the facts in a particular case, and the focus should be 'on whether potential creditors would have been misled as a result of the name the debtor was listed by' in the financing statement." *Id*.

Wheeler was not misled by FSB's financing statement that identified the debtor as "Trent Wilson." Wheeler not only had actual notice Wilson went by "Trent Wilson" and used that name itself on all of its own documentation, it also had actual knowledge of FSB's and subsequently, Bank 7's, security interest and claims to have sent FSB more than one subordination agreement. The evidence showed that a search of the records of the filing office under the only name that Wheeler knew for the debtor; "Trent Wilson", using the filing office's standard search logic would have disclosed FSB's lien filing.

Applying the construction of the controlling statutes argued for by Wheeler to the facts of this case would lead to an absurd result.  Wheeler would have this Court conclude that FSB, and subsequently Bank 7, were unperfected because they failed to file their financing statement under a debtor name ("Michael Trent Wilson") that Wheeler never would have searched for because Wheeler had never heard the name before.  Accordingly, the Court rejects Wheeler's contention that FSB's financing statement was "seriously misleading" and concludes FSB's financing statement was sufficient and effective to perfect its, and subsequently, Bank 7's, security interest.

4.     Wheeler did not file a financing statement in Oklahoma. In order for Wheeler's security interest to be perfected by filing, under Oklahoma law, Wheeler needed to file its financing statement with the Oklahoma County Clerk because Wilson was an Oklahoma resident.  Okla. Stat. tit. 12A §§ 1-9-310(a) and 1-9-501(2).  Wheeler's financing statement filed in Texas did not perfect its claimed security interest against Wilson, an Oklahoma resident.

5.     Bank 7's perfected security interest attached to Wilson's cattle as soon as Wilson acquired rights in the cattle; that is as soon as Wilson purchased the cattle.  Okla. Stat. Ann. tit. 12A, § 1-9-203.  When Wilson's cattle were sold from Wheeler's feedlot Bank 7's perfected security interest attached to the identifiable proceeds.  Okla. Stat. Ann. tit. 12A, § 1-9-315(a)(2).  Additionally, because Bank 7 had a perfected security interests in the cattle, its security interest in the identifiable proceeds was also perfected. Okla. Stat. Ann. tit. 12A, § 1-9-315(c).  Bank 7's claim against Wheeler in this case is for conversion of the cattle proceeds.

6.     Under Okla. Stat. Ann. tit. 12A, § 1-9-313(a) Wheeler's security interest in Wilson's cattle was perfected while it had possession of the cattle.  Okla. Stat. Ann. tit. 12A, § 1-9-310(b)(6).   However, such perfection continued only so long as the cattle remained in Wheeler's possession.  Okla. Stat. Ann. tit. 12A, § 1-9-313(d).  McCasland testified that Wheeler relinquished possession of the cattle to the packer when the cattle were sold from the feed yard and Wheeler did not receive payment for the cattle until the next day.   "A security interest in proceeds is a perfected security interest *if the security interest in the original collateral was perfected*."   Okla. Stat. Ann. tit. 12A, § 1-9-315 (emphasis added).  Wheeler no longer had possession of the cattle and was thus unperfected when it received the proceeds from the sale of the cattle.  Therefore the Court concludes Wheeler has failed to prove it had a perfected security interest in proceeds.

7.     "Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural lien is first perfected."  Okla. Stat. Ann. tit. 12A, § 1-9-322(a)(1).  Bank 7's security interest was perfected by FSB's financing statement filed on February 27, 2007. Between August 18, 2009 and March 11, 2012, Wheeler received $3,939,542.08 in gross proceeds from the sale of Wilson's cattle however, Wheeler did not obtain possession of these cattle and hence Wheeler did not have a perfected security interest in the cattle until after February 27, 2007.  Additionally, as previously concluded, Wheeler did not have a perfected security interest in the cattle proceeds as it had relinquished possession of the cattle before it received the cattle proceeds.  Accordingly, Bank 7's perfected security

interest in the $3,939,542.08 in proceeds Wheeler received has priority over Wheeler's security interest, even if Wheeler's security interest in the cattle was perfected by possession. Okla. Stat. Ann. tit. 12A, § 1-9-322(a)(1).

Under Okla. Stat. Ann. tit. 12A, § 1-9-322(a)(2) a perfected security interest has priority over an unperfected security interest. Bank 7 established that it had a perfected security interest in proceeds from the sales of Wilson's cattle. Wheeler failed to establish that it had a perfected security interest in proceeds from the sales of Wilson's cattle. As a consequence, Bank 7's perfected security interest in proceeds has priority over Wheeler's unperfected security interest.

8.    Wheeler has claimed it has a purchase money security interest that would give it "super priority" over Bank 7's perfected security interest even though Bank 7's perfected security interest was first in time. Okla. Stat. Ann. tit. 12A, § 1-9-324(d) provides:

d) Subject to subsection (e) of this section and except as otherwise provided in subsection (g) of this section, a perfected purchase-money security interest in livestock that are farm products has priority over a conflicting security interest in the same livestock, and, except as otherwise provided in Section 1-9-327 of this title, a perfected security interest in their identifiable proceeds and identifiable products in their unmanufactured states also has priority, if:

(1) the purchase-money security interest is perfected when the debtor receives possession of the livestock;

(2) the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;

(3) the holder of the conflicting security interest receives the notification within six (6) months before the debtor receives possession of the livestock; and

(4) the notification states that the person sending the notification has
or expects to acquire a purchase-money security interest in livestock
of the debtor and describes the livestock.

Wheeler failed to establish that it met the requirements of this statute to obtain a "super-priority" purchase money security interest in Wilson's cattle or their proceeds.  Wheeler presented no evidence that it send Bank 7 the required notification Okla. Stat. Ann. tit. 12A, § 1-9-324(d) within six (6) months before Wilson received possession of any of the cattle.  In fact, Wheeler's expert testified that he was unaware that direct notice was required for a purchase money security interest and he had no knowledge that any such notice was ever sent by Wheeler.  (See: Testimony of Van Baize, Tr. pg. 195, line 23 through pg. 196, line12).  Accordingly, the Court concludes that Wheeler did not have a "super-priority" purchase money security interest in the cattle or their proceeds.

**Wheeler's Agister's Lien**

9.     Wheeler has claimed an agister's lien under Tex. Prop. Code Ann. § 70.003 for its feed costs.  The Court concludes Wheeler has a priority agister's lien claim for the amount of its feed costs in the amount of $2,029,904.26.  Wheeler is not entitled to a priority agister's lien claim on the interest it claims as the evidence showed the interest included interest on both feed and the cost of cattle.

**Conversion**

10.    "The elements of conversion are the exercise or assumption of dominion over personal property in defiance or exclusion of the owner's rights, or a withholding of possession of such property under a claim of right or title inconsistent with that of the

true owner." *Cont'l Oil Co. v. Berry*, 1940 OK 238, 187 Okla. 390, 103 P.2d 69, 72, citing *Kelly v. Oliver Farm Equipment Sales Co.*, 1934 OK 540, 36 P.2d 888.  See, also *Harmon v. Cradduck*, 2012 OK 80, ¶ 15, 286 P.3d 643, 649.  It is not necessary that the defendant's action be taken in bad faith.  *Steenbergen v. First Fed. Sav. & Loan of Chickasha*, 1987 OK 122, 753 P.2d 1330, 1332.

Wheeler's actions in accepting the proceeds from the sale of Wilson's cattle, applying those proceeds to Wilson's debts to Wheeler and failing to remit the proceeds to Bank 7, whose perfected security interest in the proceeds had priority over Wheeler's was an "act of dominion wrongfully exerted over [Bank 7's] personal property in denial of or inconsistent with [its] rights therein" and a conversion.  *Steenbergen*, 1987 OK 122, ¶9, 753 P.2d 1330, 1332.  See, also *Farmers & Merchants National Bank, Fairview v. Fairview State Bank, Fairview*, 1988 OK 136, 766 P.2d 330; and *Consol. Equip. Sales, Inc. v. First Bank & Trust Co. of Guthrie*, 1981 OK 31, 627 P.2d 432, 434.  Bank 7 was not required to prove that it had provided the funds to purchase any of the cattle in question as its security interest covered all of Wilson's cattle, regardless of whether it had financed the purchases.  Accordingly, Wheeler is liable to Bank 7 for conversion of the amount of the outstanding principal and accrued interest on Bank 7's deficiency judgment as of trial unless Bank 7's claims are barred by one of Wheeler's affirmative defenses.

### Statute of Limitations

11.    Wheeler made a new argument at trial that Bank 7 can have no claim for conversion for cattle sales which occurred prior to Wilson's execution of the 2010

promissory notes in favor of FSB.   (See: Closing Argument, Tr. pg. 345, lines 1-13).

Wheeler's position is contrary to controlling Oklahoma law.

> A mortgage secures a debt or obligation, and not the evidence of it, and no change in the form of the evidence, or in the mode or time of payment, can operate to discharge the mortgage. So long as the debt secured remains unpaid, ***neither the renewal nor substitution of the evidence of the debt*** will impair the lien of the mortgage.

*Lincoln Nat. Life Ins. Co. v. Rider*, 1935 OK 317, 171 Okla. 262, 42 P.2d 842 (emphasis

added).   The evidence is clear that the 2010 promissory notes were renewals of Wilson's

earlier obligations owed to FSB.   The 2010 promissory notes all state on their face that

they are renewals of the earlier notes.   (See: Plaintiff's Trial Exhibits 3-7).   Wheeler's

argument that the old notes were "paid off" by the new notes ignores the fact that Wilson

remained continuously indebted to FSB on the debt secured by the lien on his cattle and

their proceeds and that the 2010 notes were merely a renewal of the evidence of that debt.

12.     Bank 7 argues the statute of limitations applicable to its conversion claim is

the three year statute of limitations contained in 12 U.S.C. § 1821(d)(14)(A)(ii).   That

statute provides:

> (A) In general
>
> Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be--
>
> **(ii)** in the case of any tort claim (other than a claim which is subject to section 1441a(b)(14) of this title), the longer of—
>
>> **(I)** the 3-year period beginning on the date the claim accrues; or
>>
>> **(II)** the period applicable under State law.

12 U.S.C.A. § 1821(d)(14)(A)(ii).  The statute of limitations in § 1821(d)(14)(A)(ii) was established as part of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA").  *UMLIC-Nine Corp. v. Lipan Springs Development Corp.*, 168 F.3d 1173, 1177 (10th Cir. 1999).  Bank 7, as the assignee of the FDIC, stands in the FDIC's shoes and receives the benefit of this statute of limitations.  *UMLIC-Nine Corp.*, 168 F.3d 1173, 1177; *F.D.I.C. v. Bledsoe*, 989 F.2d 805, 809 (1993); *Mountain States Financial Resources Corp. v. Agrawal*, 777 F. Supp. 1550, 1552 (W.D. Okla. 1991); and *SMS Financial L.L.C. v. Ragland*, 1995 OK CIV APP, 918 P.2d 400, 403.

13.    Wheeler raises a number of arguments with respect to the statute of limitations.  First, in its briefing on summary judgment, Wheeler claimed that the Supreme Court of the United States in *O'Melveny & Meyers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) abrogated the case law above-cited that Bank 7 relies on for the benefit of the three year statute of limitation in FIRREA.  Second, Wheeler argues that Bank 7 can only have the benefit of the three year statute if the cause of action had already accrued prior to Bank 7 acquiring the assets of FSB from the FDIC, and thus all cattle sales subsequent to January 28, 2011 would be subject to the two year statute of limitations in Okla. Stat. Ann. tit. 12, § 95(3).  Finally, Wheeler argues that any claims that were "stale"; i.e., on which the two year state statute of limitations had run at the time that the FDIC took over FSB cannot be revived by the three year statute of limitations in FIRREA.

14.    Contrary to Wheeler's arguments in its pre-trial briefing, *O'Melveny & Meyers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) did not overrule or

abrogate the line of authority that provides Bank 7 with the benefit of the FIRREA statute of limitations.  In *O'Melveny* the Supreme Court ruled that state law, rather than federal law, governs imputation of a corporate officer's knowledge of fraud to corporation asserting cause of action created by state law and to whether knowledge of fraudulent conduct of S&L's officers could be imputed to FDIC suing as receiver.  The Court did not address the rights of an assignee of the FDIC and particularly the right of such an assignee to assert the three year statute of limitations in 12 U.S.C.A. § 1821(d)(14)(A)(ii). The 10th Circuit's opinion in *UMLIC-Nine Corp. v. Lipan Springs Development Corp*., 168 F.3d 1173, 1177 (10th Cir. 1999), which held that an assignee of the Resolution Trust Corporation was entitled to the three year statute of limitation in 12 U.S.C. § 1821(d)(14)(A)(ii), was promulgated five years after the Supreme Court's *O'Melveny* decision and demonstrates the established rule that assignees of the FDIC receive the benefit of the FIRREA statute of limitations has not been overruled.

15.    Wheeler cited no authority for its second argument; that the three year statute of limitations in FIRREA can only apply to causes of action that were in existence at the time that the FDIC was the receiver of FSB.  However, at least two federal courts have refused to extend FIRREA's six year statute of limitations that applies to contract claims to assignees of the FDIC where the notes were not in default until after the assignee had acquired them.  *See Beckley Capital Ltd. P'ship v. DiGeronimo,* 184 F.3d 52, 58 (1st Cir.1999) ( "[T]he assignee does not get this benefit where an obligation is transferred by the FDIC before it is in default."); *Cadle Co. v. 1007 Joint Venture,* 82 F.3d 102, 105 (5th Cir.1996) ("We agree with Joint Venture that an assignee of the FDIC

can invoke FIRREA's six-year period of limitations only if the note at issue was in default either before the FDIC acquired it or while the FDIC owned it.").  In *In re Legal Econometrics, Inc.*, 169 B.R. 876, 884 (Bankr. N.D. TX 1994) the bankruptcy court applied the same rule to tort claims; holding the assignee did not get the benefit of the three year statute of limitation for torts where "none of the acts complained of . . . occurred until . . . long *after"* the FDIC had sold the loan.  (Emphasis by the court).

The contract cases cited are not controlling in this case where Bank 7's cause of action is for conversion.  However, in the present case, under the terms of the promissory notes, the notes were subject to acceleration if "all or any part of the collateral for the debt evidenced by this Note is lost, stolen, substantially damaged or destroyed."  (See: Plaintiff's Trial Exhibits 3-7).  Hence the notes were in default when the FDIC acquired FSB's assets, as Wilson had selling off the cattle that were the collateral for the notes for some time at that point.

While a number of the cattle sales at issue herein occurred after Bank 7 had acquired the loans from the FDIC, the Court does not recognize each sale as a discrete wrong giving rise to a separate calculation of the running of the statute of limitations. The Tenth Circuit has recognized the "continuing wrong doctrine" which holds "where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury." *United States v. Hess*, 194 F.3d 1164, 1176 (10th Cir. 1999), quoting *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1430 (10th Cir. 1996).  See, also 54 C.J.S. Limitations of Actions § 132 (Where parties plead as a *single continuing event* a series of distinct events, each of which gives rise to a separate

cause of action, the "continuing claims doctrine" saves the later arising claims, even if the statute of limitations has lapsed for the earlier events).  Application of this doctrine to the facts of this case would make the cattle sales that occurred subsequent to Bank 7's acquisition of the loans part and parcel of the same "continuing wrong" that had begun prior to the FDIC taking over FSB.  As the "continuing wrong" was ongoing at the time the FDIC acquired FSB's assets and assigned them to Bank 7, the Court concludes there is no sound basis for denying Bank 7 the benefit of FIRREA's three year statute of limitations for those sales that occurred after Bank 7 acquired the assets.  This case is not analogous to *In re Legal Econometrics, Inc.*, 169 B.R. 876, 884 (Bankr. N.D. TX 1994) where the court relied on the fact that *none* of the tortious conduct occurred until after the assignment by the FDIC.

16.     Wheeler's contention that Bank 7 cannot recover on any claims that were already barred under the two year state statute of limitations in Okla. Stat. Ann. tit. 12, § 95(3) was again asserted by Wheeler without supporting authority.  Nonetheless Wheeler has correctly stated the law.  See: *UMLIC-Nine Corp. v. Lipan Springs Development Corp.*, 168 F.3d 1173, 1177 (10th Cir. 1999).  The FDIC acquired FSB on January 28, 2011.  The earliest cattle sale at issue here occurred on August 18, 2009.  (See: Plaintiff's Trial Exhibit 63).  Consequently, none of the conversions of cattle proceeds by Wheeler were barred by the two year statute of limitations in Okla. Stat. Ann. tit. 12, § 95(3) when the FDIC acquired FSB's assets and assigned them to Bank 7.

17.     In any event, the Court concludes Bank 7's claims are not barred by the statute of limitations regardless of whether the three year statute in 12 U.S.C. §

1821(d)(14)(A)(ii) or the two year statute in Okla. Stat. Ann. tit. 12, § 95(3) applies. Under Oklahoma law, conversion claims are subject to the discovery rule which holds a cause of action accrues when the injured party knows, or in the exercise of reasonable diligence should have known of the injury and could have maintained his claim to a successful conclusion.  See, *Kordis v. Kordis,* 2001 OK 99, 37 P. 3d 866, 869, n. 3; and *In re 1973 John Deere Tractor*, 1991 OK 79, 816 P.2d 1126, 1134.

Prior to the phone call from Sharon Wilson to Eric Thompson in February or March of 2014, the only evidence FSB, and subsequently Bank 7 had access to regarding the relationship between Wilson and Wheeler were the "Bill of Sale Drafts" from Wheeler and checks from Wheeler to Wilson maintained in the bank's archived records. The testimony was overwhelming, even from Wheeler's own witnesses, that the "Bill of Sale Drafts" were misleading and did not reveal the true nature of the relationship between Wheeler and Wilson and appeared on their face to be consistent with Wilson's order-buying.  Indeed, Wilson continued to testify under oath as late as September of 2013 that the "Bill of Sale Drafts" did reflect his order buying for Wheeler and that he was not feeding cattle at Wheeler.  The checks from Wheeler did not identify that they were cattle proceeds (in fact McCasland testified that some of them could have been for trucking).  Wheeler did not have a signed subordination agreement from Wilson and failed to prove that Bank 7 had ever received a subordination agreement.  Wheeler's assertion that the documents in the banks' archived records should have caused FSB to call Wheeler and inquire into the nature of the relationship between Wilson and Wheeler and that a phone call would have revealed everything is unconvincing in light of the

undisputed evidence that Wheeler failed to properly respond to a federal subpoena for its documents related to Wilson and it took a follow up telephone call, two letters and a subpoenaed deposition to get Wheeler to finally, in August of 2014, produce its financing documents with Wilson.

Further, had Wheeler filed its own lien claim in the proper state; Oklahoma, as required by the Uniform Commercial Code, it would have been added as a party defendant to the state-court foreclosure action filed in 2012. The law requires the filing of financing statements in a specific place, here the office of County Clerk of the State of Oklahoma, in order to perfect a security interest. Okla. Stat. tit. 12A §§ 1-9-310(a) and 1-9-501(2). Accordingly, Bank 7 exercised due diligence, as a matter of law, in checking the office where any lien claim such as Wheeler's should have been filed. But Wheeler failed to file its financing statement in the proper state and Wheeler admits no one at Wheeler ever spoke to anyone at FSB.

Wheeler has asked the Court to make an adverse inference against Bank 7 based on the fact that FSB's former president, Gregg Ward, who had been Wilson's loan officer prior to the FDIC taking over the bank, refused to testify in this case; asserting his 5th Amendment privilege against self-incrimination. Presumably Wheeler's request is for an inference that FSB had knowledge of Wilson's dealings with Wheeler. The Court concludes such an inference is not warranted under the facts of this case. The inference would require the Court to impute to the bank the presumed (but unproven) knowledge of Gregg Ward. It is the general rule that "[a] corporation is charged with knowledge of all material facts of which its officer or agent receives notice or acquires knowledge while

acting in the course of his employment and within the scope of his authority." *Maryland Cas. Co. v. Tulsa Indus. Loan & Inv. Co.*, 83 F.2d 14, 17 (10th Cir. 1936). However, "if in the course of his employment the agent acts for his own benefit and to defraud his principal, the latter is not charged with constructive knowledge of the uncommunicated facts in the transaction." *Id.* Participation in the wrongdoing which caused a loss to the corporation will not be imputed to the corporation. *See Alfalfa Elec. Co-op, Inc. v. Travelers Indem. Co.*, 376 F.Supp. 901 (W.D. Okla. 1973); *Adair State Bank v. American Cas. Co. of Reading, Pennsylvania*, 949 F.2d 1067 (10th Cir. 1991) (overruled on other grounds) (citing *Federal Deposit Ins. Corp. v. Aetna Casualty and Sur. Co.*, 426 F.2d 729, 739 (5th Cir. 1970) (knowledge of defalcator "and the directors associated with him cannot be imputed to the Bank since they were acting adversely to its interests.")). *See also*, *Comeau v. Rupp*, 810 F.Supp. 1127 (D. Kan. 1992) ("the exception to the general rule of respondeat superior focuses on whether the misdeeds of corporate employees worked to the benefit or detriment of the corporation. If the corporation's agent acted adversely to the interests of the corporation, the agent's acts are not imputed to the corporation." (citing *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982) and *Adair State Bank*, 949 F.2d 1067, *supra*)). In *Adair State Bank*, *supra*, the Tenth Circuit found the knowledge of the bank's senior vice president that a bank customer could not pay overdrafts, despite the fact that the vice president continued to allow the same, was not imputed to the organization because she concealed information from the bank which adversely affected its well-being. 949 F.2d at 1074. *Adair State Bank* is controlling here. Gregg Ward's alleged (but unproven) knowledge of Wilson's dealings with Wheeler

should not be imputed to Bank 7.  In possibly concealing information from FSB that was detrimental to FSB's interests, Ward was acting outside of the scope of his authority and in his own interest rather than the interests of the bank.

Bank 7 exercised reasonable diligence in attempting to learn the relationship between Wilson and Wheeler and even so, did not obtain sufficient information to know that it had a claim against Wheeler for conversion of cattle proceeds until July 17, 2014 when it took the deposition of Stacy McCasland, vice president and manager of Wheeler. As a result, Bank 7's Complaint herein, filed August 4, 2014, is not barred by the statute of limitations regardless of whether the two or three year statute is applied.

### Waiver

18.     Wheeler has argued Bank 7 waived its security interest and its conversion claim by authorizing Wilson to sell cattle, whether expressly or implicitly.  The relevant Code section provides:

> (1)  a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and

> (2) a security interest attaches to any identifiable proceeds of collateral.

Okla. Stat. Ann. tit. 12A, § 1-9-315.  The waiver language of the statute: "unless the secured party authorized the disposition" only applies to paragraph (1) which addresses the secured party's security interest in the collateral itself.  Paragraph (2), which provides that the security interest will continue in identifiable proceeds after the sale of the collateral, does not contain similar waiver language.  It is clear from the controlling

decision in *First Nat. Bank & Trust Co. of Oklahoma City v. Iowa Beef Processors, Inc.*, 626 F.2d 764 (10th Cir. 1980) that authorization of the sale does not waive the continuing security interest in proceeds.  In *Iowa Beef Processors* there were two sales; on the first the defendant had paid the borrower for the cattle and the money was gone.  The 10th Circuit held the bank had waived its security interest in the cattle that were sold because it authorized cattle sales.  On the second sale the purchaser had never paid anyone for the cattle and the court held: "The bank has a security interest in the proceeds of the sale by virtue of Okla.Stat.Ann. tit. 12A, s 9-306(2) (West 1963)[1] and its security agreement." *Id*. at 769.  Wheeler presented no evidence that Bank 7 authorized any interference with its right to claim the proceeds from Wilson's cattle sales.

19.     Bank 7 was not entitled to offset Wilson's debts with the funds in Wilson's special account, used for order buying.  An order-buying account is considered to be a trust account and the funds provided by the order buyer's customer are held in trust by the order buyer to pay for the cattle delivered to the customer.  *Blackwell Livestock Auction, Inc. v Community Bank of Shidler, Oklahoma*, 1993 OK CIV APP 161, 864 P.2d 1297 (1993).  Accordingly, neither FSB nor Bank 7 had the ability to simply offset funds in that account against Wilson's obligations.

20.     "Waiver is the voluntary and intentional relinquishment of a known right." *Barringer v. Baptist Healthcare of Oklahoma*, 2001 OK 29, ¶ 22, 22 P.3d 695, 700-01, citing *Faulkenberry v. Kansas City Southern Ry. Co.,* 1979 OK 142, 602 P.2d 203, 206-07.  "The doctrine is essentially a matter of intention, focusing on the intent of the party

---

[1] Now Okla. Stat. Ann. tit. 12A, § 1-9-315.

against whom waiver is asserted." *Id.*, citing *State ex rel. Gaines v. Beaver,* 1945 OK 318, 166 P.2d 776; *Archer v. Wedderien,* 1968 OK 186, 446 P.2d 43.  The testimony showed that the funds from Wheeler that passed through Wilson's special account were not cattle proceeds; they were loan proceeds Wheeler was providing Wilson in order to purchase cattle.  While the testimony was conflicting, both McCasland and Wheeler's expert, Baize, admitted that the loan proceeds from Wheeler were used to cover Wilson's checks to purchase cattle.  Wheeler's counsel has argued that FSB and subsequently Bank 7 received the money for the cattle and applied it to Wilson's debt.  However the loan note histories do not reflect payments on the notes consistent with that theory.  (See: Plaintiff's Trial Exhibits 3-7).  The fact that Wheeler's loan proceeds passed through Wilson's special account cannot be deemed a knowing and intentional relinquishment by Bank 7 of its right to receive the cattle proceeds in which it had a perfected security interest.  There was no evidence that FSB or Bank 7 had knowledge that the loan proceeds were related to the cattle in which Bank 7 held a perfected security interest.  Bank 7 did not waive its right to recover for Wheeler's conversion of cattle proceeds by not offsetting Wilson's debts against the loan proceeds deposited in his special account, nor did the fact that Wheeler's loan proceeds passed through Wilson's account establish waiver.

## Collateral Estoppel/Issue Preclusion

21.     The decision of the bankruptcy court in the adversary proceeding between Bank 7 and Wilson in Wilson's Chapter 7 bankruptcy has no preclusive effect with respect to the issues in this case.  "Issue preclusion, ... bars 'successive litigation of an

issue of fact or law actually litigated and resolved in a valid court determination *essential to the prior judgment*.'"   *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S.Ct. 2161171 L.Ed.2d 155 (2008) (emphasis added).  Issue preclusion will apply where the issue was actually litigated and resolved in a valid court determination and "essential to the prior judgment."  *In re Zwanziger*, 741 F.3d 74, 77 (10th Cir. 2014).  This Court concludes that the issue of the lien priorities between the parties to the case at bar was not before the bankruptcy court; Wheeler was not a party to the adversary proceeding and the issue of whether Wheeler is liable for conversion was not before the bankruptcy court.  Nor was the issue of when Bank 7 should or could have discovered its conversion claim against Wheeler for purposes of the statute of limitations before the bankruptcy court.  To the extent the bankruptcy court actually made any determination as to any of these issues, such determination was not essential to its judgment that ruled solely on the dishchargeability in bankruptcy of Wilson's debt to Bank 7.  Accordingly, the Court concludes Bank 7's claims are not barred by collateral estoppel or issue preclusion.

<div style="margin-left:40%">

Respectfully submitted,

s/ *Julia C. Rieman*
Douglas L. Jackson   OBA #4583
Julia C. Rieman  OBA #15337
GUNGOLL, JACKSON, BOX & DEVOLL, P.C.
Post Office Box 1549
323 West Broadway
Enid, Oklahoma 73702-1549
(580) 234-0436 - telephone
(580) 233-1284 – facsimile
rieman@gungolljackson.com

Attorneys for Plaintiff

</div>

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2015, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

John F. Massouh – Attorney for Defendant

Briana J. Ross – Attorney for Defendant

Kevin T. Wakley – Attorney for Defendant

<div align="right">

s/ *Julia C. Rieman*
Julia C. Rieman

</div>